OVERSEERS OF WESTFIELD *v.* OVERSEERS OF WARREN.

1. The rules of evidence are the same in settlement cases as in ordinary cases, therefore hearsay evidence which would be excluded in the latter, must be rejected in the former class of cases also.

2. Although in questions of pedigree the declarations of deceased members of a family as to marriages are admitted, yet where the marriage is to be shown as a substantive, independent fact, it is within none of the exceptions to the general rule, and hearsay evidence cannot be received.

*Chetwood,* for Westfield.

*Frelinghuysen,* for Warren.

The opinion of the Court was delivered by

EWING, C. J. The pauper Ann Meads was born in the township of Warren whither she was sent from Westfield by the order of removal which was quashed by the Court of General Quarter Sessions, and where, from her settlement by birth, she undoubtedly belongs unless a subsequent settlement is shewn.

On the part of Warren, a subsequent settlement in Westfield is alleged from her marriage to Daniel Meads, who was

seized of a freehold in a lot of land in the latter township, admitted to have been worth more than fifty pounds, and lived on it "a year or so."

Westfield insists this marriage to Meads was illegal and void, and hence no settlement gained by it, because she was at the time the wife of Amos Monroe, then in full life, to whom, as she testified in the Court of Quarter Sessions, she was married at the age of about sixteen years "by Parson Woodruff of Westfield," with whom she lived upwards of nineteen years and had seven children, and from whom she had never been divorced:—and that although she lived with Meads for sixteen or seventeen years after Monroe's death, she was not after that event married to him.

Warren again insists that the marriage to Monroe was void, because he had been previously married and had a wife then alive.

The question then on which the cause depends is whether legal evidence was given by Warren of the marriage of Monroe previous to his marriage with the pauper.

The evidence of such marriage is from the pauper herself, who testified that "Monroe as she understood, came from New England—she heard he had a wife living in Goshen—the people that came down from Goshen used to tell of it frequently—she was once at Goshen and saw a woman there who was said to be his daughter. When she lived at Sussex on the Delaware at Dingman's ferry, there was a woman came there who said she was going to Susquehanna county to see her children—she said she was Monroe's wife. Witness [the pauper] spoke to Monroe about it. Monroe admitted the said woman was his wife, and had four children by her, and when witness reproved him he said he could sleep with both. Immediately after this the witness left him, and never lived with him afterwards and then married Meads."

The only parts of this testimony which can with any propriety be urged in the proof of the marriage are, the decla-

ration by the woman who came to Dingman's ferry and the admission by Monroe that she was his wife. Who were " the people that came down from Goshen "—what were their opportunities of knowledge—from what sources they drew their information—do not appear. The rule which admits hearsay evidence in cases of pedigree, according to some, perhaps the best authorities, receives it only from deceased members of the family; and according to those which allow the greatest latitude, only from those persons who from living in habits of intimacy with the family or from other peculiar circumstances are likely to have known the facts concerning which their declarations are offered. *Peake* 11; *Phillips* 186; *Higham* v. *Ridgeway, per Le Blanc, Just.* 10 *East.* 120; *Whitelock* v. *Baker*, 13 *Vezey,* 514; *Jackson* v. *Browner*, 18 *John.* 39; *Rex* v. *Eriswell, Per Lord Kenyon* 3, *T. R.* 723, *Berkely Peerage case* 4 *Campb. Per Lawrence J.* 408, *Per Mansfield, C. J.* 414. The woman who was said to be Monroe's daughter may have been called, and may have been so without a marriage. The facts, that the pauper on the admission made by Monroe left him—that he living in the neighborhood did not reclaim her, and she afterwards married Meads, may prove that he was weary of her, and parted with her readily, or that she was sincere in the belief of what he admitted to her—but are no legal proof whatever of his marriage.

The character of the declarations made by Monroe and his alleged wife are now to be examined. They were made without oath, in no judicial proceeding, and in the absence of the present parties. Whatever force they might have or respect they might deserve, as admissions, in case the persons by whom they were made were parties, it is manifest that in the present case and between these parties, they are only the declarations of persons not sworn and not cross examined. As to the fact of marriage then, the proof of these declarations is evidence only of what persons have been heard to say. Nor as to any legal effect on the parties in

this cause is there any difference that the persons by whom the declarations were made were the alleged man and wife. The evidence then is purely of the kind denominated hearsay—and such evidence, unless admissible generally to establish a marriage, or specially on a question of settlement, cannot be received here. These points are to be considered.

The general rule of evidence excludes all hearsay. From necessity and from the impracticability, in some instances, of other proof, exceptions to this rule have been made. One of these is found in questions of pedigree. There, declarations of deceased members of a family as to marriages, as well as births and deaths, are admitted. The evidence of the marriage however is in such case, but incidental to the proof of pedigree. And to such extent only; to the admission of such evidence for such purpose merely, is the exception limited. Where marriage, as in the case before us, is to be shewn as a substantive, independent fact, it is within none of the exceptions to the general rule, and hearsay evidence cannot be received. I no not mean that proof of actual marriage must always be given. The rule of evidence seems settled to require such proof in two cases only, bigamy and crim. con. *Morris* v. *Miller*, 4 *Burr.* 2057; *Birt* v. *Barlow, Doug.* 171; *Fenton* v. *Read*, 4 *John.* 52. In other cases, facts raising a presumption of marriage, facts from which an inference of marriage may be justly drawn, will suffice. As in other subjects of evidence, so here, circumstances naturally or necessarily connected with the matter to be shewn, satisfy the requirements of law and of truth. Thus, in the case of *Rex* v. *Stockland,* cited by the counsel of Warren, *Burr. Sett. cases* 508, cohabitation as man and wife for thirty years was deemed sufficient evidence of marriage to be the foundation of an order of removal.

Nor is there one rule of evidence for ordinary cases, and another for questions of settlement. One common principle

governs all. Hearsay is excluded alike from the latter as from the former. And surely such is the dictate of reason as well as the rule of law. Truth and the means of investigating, demonstrating and attaining it, must be uniform. A contrary position seems for a time to have found countenance and support in the case of *Rex* v. *Nutley*, cited by the counsel of Warren, *Burr. Sett. cases* 701, and the cases of *Rex* v. *Greenwich*, *ibid.* 243, and *Rex* v. *Wareham*, *Cald.* 141; but has been completely exploded by the elaborate and conclusive arguments of *Lord Kenyon and Justice Grose*, in *Rex* v. *Eriswell*, 3 *T. R.* 707—and by the cases of *Rex* v. *Nuneham Courtney*, 1 *East.* 373; *Rex* v. *Chadderton*, 2 *East.* 27; *Rex* v. *Ferrybridge*, *ibid.* 52; *Rex* v. *Abergwilly*, *ibid.* 63, and *Rex* v. *Erith*, 8 *East.* 539.

In *Rex* v. *Eriswell*, *Grose* says, " I have commented on the decisions which were cited on the argument, the earliest of them being in 1739, and in no one of them has the question fairly or fully come before the court or been decided on as a principal question." And again, " In this case I find the general rule—I find no decided authority that forms an exception to it, and nothing but a clear, uncontroverted decision upon the point, and not the concession of counsel or the *obiter dictum* of a Judge ought to form an exception to a general rule of law framed in wisdom by our ancestors, and adopted in every case except where the exception is as ancient as the rule." *Lord Kenyon,* reviewing the above mentioned cases of *Nutley, Greenwich and Wareham,* says, " There is no one case in which the point has been decided. But even if there had, as it would have stood single in opposition to a series of cases I should not have much reliance on the superstructure when the foundation failed." In the case of *Rex.* v. *Nuneham Courtney,* the examination in writing of the pauper touching his place of settlement taken under oath before the two Justices by whom the order of removal was made, the pauper having before the trial in the sessions absconded, and on due search being undiscov-

erable, was declared inadmissible. In *Rex* v. *Chadderton*, the pauper had testified in the sessions that his mother being with child of a bastard some few years after his father's death, went from another township to Chadderton, and as he had heard from his mother who had been dead for some years, she was relieved there by Chadderton. *Lord Kenyon* says, " The hearsay from the pauper's mother is no evidence at all of any fact." In *Rex* v. *Ferrybridge*, the testimony of a widow of what she had heard her deceased husband say respecting his settlement, and an examination in writing of the husband taken in his lifetime under oath before two justices, were both declared incompetent. And *Lord Kenyon* remarked that the point on which the court were divided in the case of *Rex* v. *Eriswell*, had been since considered clear against the admissiblity of the evidence either as to the hearsay of the pauper or his examination in writing. In *Rex* v. *Erith*, the testimony of the pauper to declarations of his deceased father as to the place of the pauper's birth was inadmissible to shew his settlement by birth.

It appears to me then, there was no legal evidence before the sessions of the alleged marriage of Monroe previous to his marriage with the pauper, which therefore was not invalidated. And inasmuch as he is long since dead, and his settlement not shewn, she was properly removed to Warren, the place of her settlement by birth; *Rex* v. *Norton, Burr. Sett. cases* 122, *Rex* v. *St. Botolph, ibid.* 367, *Rex* v. *Hensingham, Cald.* 206, *Rex* v. *Woodsford, ibid.* 236, *Rex* v. *Edisore, ibid.* 371.

Let the order of the sessions be quashed and the order of removal be affirmed.